FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.

★   SEP 1 3 2004   ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CV

04  3950 -

------------------------------------------------------------x

SILVAN KURZBERG; PAUL KURZBERG; YARON SHMUEL; and
OMER GAVRIEL MARMARI,

                                        Plaintiffs,                    **COMPLAINT**

                        -against-                                      **Jury Trial Demanded**

JOHN ASHCROFT, Attorney General of the United States; JAMES
W. ZIGLAR (Former Commissioner of the Immigration and
Naturalization Service); MICHAEL ZENK (Warden of the
Metropolitan Detention Center); DENNIS HASTY (former Warden          **GLEESON, J.**
of the Metropolitan Detention Center) KATHLEEN HAWK
SAWYER (former Director of the Federal Bureau of Prisons); LINDA     **POLLAK, M.J.**
THOMAS (former Associate Warden of Programs of the
Metropolitan Detention Center); ROBERT MUELLER (Director of
the Federal Bureau of Investigation); KEVIN LOPEZ (believed to be
an employee of the Federal Bureau of Prisons); S. CHASE (believed
to be an employee of the Federal Bureau of Prisons); "JORDAN"
(believed to be an employee of the Federal Bureau of Prisons, whose
true first and last names are unknown to the plaintiffs, who believe
they heard him being called "Jordan") MARIO MACHADO
(believed to be an employee of the Federal Bureau of Prisons);
WILLIAM BECK (believed to be an employee of the Federal Bureau
of Prisons); RICHARD DIAZ (believed to be an employee of the
Federal Bureau of Prisons); C. SHACKS (first name unknown first
name unknown, believed to be an employee of the Federal Bureau of
Prisons); SALVATORE LOPRESTI (believed to be an employee of
the Federal Bureau of Prisons); STEVEN BARRERE (believed to be
an employee of the Federal Bureau of Prisons); JON OSTEEN
(believed to be an employee of the Federal Bureau of Prisons); J.
MIELES (first name unknown, believed to be an employee of the
Federal Bureau of Prisons); MICHAEL DEFRANCISCO (believed to
be an employee of the Federal Bureau of Prisons); F. JOHNSON (first
name unknown, believed to be an employee of the Federal Bureau of
Prisons); CHRISTPHOR WITSCHEL (believed to be an employee of
the Federal Bureau of Prisons); MOSCHELLO (first name unknown,
believed to be an employee of the Federal Bureau of Prisons);

NORMAN (first name unknown, believed to be an employee of the
Federal Bureau of Prisons); HOSAIN (first name unknown, believed
to be an employee of the Federal Bureau of Prisons); MOUNBO (first
name unknown, believed to be an employee of the Federal Bureau of
Prisons); M. ROBINSON (first name unknown, believed to be an
employee of the Federal Bureau of Prisons); TORRES (first name
unknown, believed to be an employee of the Federal Bureau of
Prisons) COUNSELOR RAYMOND COTTON (believed to be an
employee of the Federal Bureau of Prisons); DR. LORENZO (first
name unknown, believed to be an employee of the Federal Bureau of
Prisons); LIEUTENANT BIRAR (first name unknown, believed to be
an employee of the Federal Bureau of Prisons); LIEUTENANT
BUCK (first name unknown, believed to be an employee of the
Federal Bureau of Prisons); LIEUTENANT T. CUSH (first name
unknown, believed to be an employee of the Federal Bureau of
Prisons); LIEUTENANT GUSS (first name unknown, believed to be
an employee of the Federal Bureau of Prisons); LIEUTENANT D.
ORTIZ (first name unknown, believed to be an employee of the
Federal Bureau of Prisons); LIEUTENANT J. PEREZ (first name
unknown, believed to be an employee of the Federal Bureau of
Prisons); UNIT MANAGER C. SHACKS (first name unknown,
believed to be an employee of the Federal Bureau of Prisons); JOHN
DOES 1-30, Metropolitan Detention Center Corrections Officers,
"John Doe" being fictional first and last names, intended to be the
corrections officers at the Metropolitan Detention Center who
abused the plaintiffs and violated their rights, and whose identities
are known to the defendants but at this time unknown to the
plaintiffs; JOHN ROES 1-30, Federal Bureau of Investigation and/or
Immigration and Naturalization Service Agents, "John Roe" being
fictional first and last names, intended to be the corrections officers
at the Metropolitan Detention Center who abused the plaintiffs and
violated their rights, and whose identities are known to the
defendants but at this time unknown to the plaintiffs,

                                        Defendants.

--------------------------------------------------------------------------X


            Plaintiffs, complaining of the defendants, by their attorneys, JAROSLAWICZ &

JAROS, allege for their complaint as follows:

## NATURE OF ACTION

1.     Plaintiffs bring this action on behalf of themselves as individuals who were detained on minor immigration violations following the September 11, 2001 terrorist attacks on the United States ("post-9/11 detainees"), treated as "of interest" to the government's terrorism investigation and subjected to a blanket "hold until cleared policy" pursuant to which the Immigration and Naturalization Service ("INS") denied them bond without regard to evidence of dangerousness or flight risk, and detained them until the Federal Bureau of Investigation ("FBI") cleared them of terrorist ties (OIG Report[1] at 69-70). All Plaintiffs were in fact cleared of any connection to terrorism. (*Id.* at 27). Plaintiffs have been subjected to one or more of the following unconstitutional policies and practices: (a) once placed in detention, they were not timely served with a Notice to Appear or any other notice of the charges on which they were being held and were thereby impaired in their ability to understand the reason for their detention, obtain legal counsel, and request release on bond (*id.* at 27-31); (b) some were classified as being "of high interest" to the government's terrorism investigation, "Witness Security" and/or "Management Interest Group 155" detainees in the absence of adequate standards or procedures for making such a determination or evidence that they were involved in terrorism and, on the basis of these classifications, housed in one of the most highly restrictive prison settings possible, the Administrative Maximum Special Housing Unit ("ADMAX SHU") of the Metropolitan Detention Center ("MDC") in Brooklyn, New York (*id.* at 18, 115-16); (c) their access to counsel and their ability to seek redress in the courts (*id.* 112-14); and/or (d) after receiving final removal orders or grants of voluntary departure, they were held in immigration custody far beyond the period necessary to secure their removal or

---

[1] References throughout to the "OIG Report" are to a report released by the Office of the Inspector General of the U.S. Department of Justice on June 2, 2003, entitled "The September 11 Detainees: A Review of the Treatment of Aliens Held on Immigration Charges in Connection with the Investigation of the September 11 Attacks." A copy of this report is appended as Exhibit 1.

voluntary departure from the United States, again without regard to whether they posed a danger or flight risk. (*Id.* at 105).

2.      As a matter of policy and practice, Defendant kept Plaintiffs in custody for extended time periods without evidence that they posed a danger of flight risk pursuant to a "hold until cleared policy," not for any legitimate immigration law enforcement purpose, but to incarcerate them—without probable cause—while law enforcement authorities sought to determine whether they had any ties to terrorism. Individuals were deemed "of interest" to the terrorism investigation even where Defendants had no affirmative evidence of a connection to terrorism, so long as the FBI could not immediately rule out any connection. (*Id.* at 18). After the September 11 attacks, Defendants also adopted a policy of denying bond to any non-citizen deemed "of interest" to the terrorism investigation, even when Defendants had no evidence that the person as dangerous, a flight risk, or connected to terrorism. (*Id.* at 76, 78). Instead of being presumed innocent until proven guilty, these post-9/11 detainees were presumed guilty of terrorism until proven innocent to the satisfaction of law enforcement authorities. By adopting, promulgating, and implementing these policies and practices, Defendants John Ashcroft, Robert Mueller, James Ziglar, and others have intentionally or recklessly violated rights guaranteed to Plaintiffs by the Fourth and Fifth Amendments to the United States Constitution, customary international law, and treaty law.

3.      While in detention, the Plaintiffs were subjected to unreasonable and excessively harsh conditions. Were kept in federal facilities, such as the ADMAX SHU of the MDC where they have been placed in tiny cells for over 23 hours a day and strip-searched, manacled, and shackled when taken out of their cells. Plaintiffs suffered physical and verbal abuse by their guards. Plaintiffs were beaten. Plaintiffs were denied the ability to practice their faith during their detention. By subjecting Plaintiffs to unreasonable and excessively harsh conditions and penalizing them for the practice of their faith, the Defendants intentionally and/or recklessly violated rights guaranteed to Plaintiffs under the First, Fourth, and Fifth

Amendments to the United States Constitution, and under customary international law and treaty law.

4.      While in the ADMAX SHU, Plaintiffs were subjected to a pattern and practice of cruel, inhuman, and degrading treatment in violation of the First, Fourth, Fifth, Sixth, and Eighth Amendments to the United States Constitution, federal statutory law, customary international law, and local law. Among other things, they were deliberately and cruelly subjected to numerous instances of excessive force and verbal abuse, unlawful strip and body cavity-searches, the denial of medical treatment, the denial of adequate nutrition, extended detention in solitary confinement, the denial of adequate exercise, and deliberate interference with their rights to counsel and to exercise of their sincere religious beliefs. They were placed in tiny cells for more than 23 hours per day, and strip-searched, manacled and shackled when removed from their cells. Plaintiffs were housed in the ADMAX SHU in the absence of adequate standards or procedures for determining that such a classification was appropriate, or that the classification should continue, in violation of the Fifth Amendment to the United States Constitution.

5.      Plaintiffs were singled out for such mistreatment because of their race, national origin, and religion. Defendants, by creating, participating in, and endorsing Plaintiffs' systematic mistreatment, violated the principles enunciated in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, the Religious Freedom Restoration Act ("RFRA"), 42 USC § 2000bb, the civil rights conspiracy statute, 42 U.S.C. § 1985(3), and New York City's Human Rights Law ("NYCHRL"), N.Y.C. Code §§8-107, 8-502.

6.      Even though Defendants kept Plaintiffs detention for the sole purpose of criminal investigation, Defendants did provide them with the rights to which those suspected of crimes are entitled under the Constitution. Defendants failed to provide them with a hearing before a neutral judicial officer to determine whether Defendants had probable cause to believe

that the Plaintiffs were engaged in criminal activity. In addition, Defendants failed to provide Plaintiffs with a criminal indictment or information citing criminal charges on which the detention was based, much less with counsel or a speedy trial. Instead of being afforded these fundamental protections, Plaintiffs were detained indefinitely pending the outcome of FBI and INS clearance. In adopting, promulgating, and implementing this policy and practice, Defendants Ashcroft, Mueller, Ziglar, and others intentionally or recklessly violated rights guaranteed to Plaintiffs by the Fourth and Sixth Amendments to the Constitution.

7.     Defendants adopted policies and practices that impeded and interfered with Plaintiffs' ability to obtain legal representation and thereby gain access to court. They did so by, among other things, not serving Notices to Appear on a timely basis, thereby delaying bond redetermination hearings (*id.* at 27-31); imposing an initial communications blackout (*id.* at 112-14) and severely limiting phone calls to lawyers even after the blackout ended (*id.* at 130-31); and assigning certain Plaintiffs to the ADMAX SHU. (*Id.* at 18, 115-116). In adopting, promulgating, and implementing this policy and practice, Defendants and others intentionally or recklessly violated rights guaranteed to Plaintiffs by the First and Fifth Amendments to the Constitution.

8.     At the time of Plaintiffs' arrests, Defendants confiscated personal identification, money, and valuable personal items from all Plaintiffs. In addition, upon information and belief, Defendants searched the homes of Plaintiffs while they were in detention and confiscated items in their homes. When Plaintiffs demanded the return of these items at the time they were released from confinement for removal or voluntary departure from the United States, Defendants deliberately deprived Plaintiffs of these items. By adopting, promulgating, and implementing this policy and practice, Defendants and others have intentionally violated rights guaranteed to Plaintiffs under the Fifth Amendment to the Constitution.

9.      During their confinement, Defendants subjected Plaintiffs to coercive and involuntary and incriminating interrogation designed to overcome their will and coerce involuntary and incriminating statements from them. By adopting, promulgating, and implementing this policy and practice, Defendants and others intentionally violated rights guaranteed to Plaintiffs un the Fifth Amendment to the Constitution.

10.     In arresting Plaintiffs, denying them bond without an adequate evidentiary basis, detaining them under unreasonable and excessively harsh conditions, and holding them far beyond the time necessary to effectuate their removal, Defendants and others have also engaged in racial, religious, ethnic, and/or national origin profiling. Plaintiffs' ' race, religion, ethnicity, and/or national origin played a determinative role in Defendants' decision to detain them initially, to subject them to a blanket non-bond policy, to subject them to punishing and dangerous conditions of confinement, and then to keep them detained beyond the point at which removal or voluntary departure could have been effectuated, in violation of the rights guaranteed to them by the Fifth Amendment to the Constitution.

11.     Plaintiffs seek a judgment declaring that Defendants' actions, practices, customs, and policies, and those of all persons acting on their behalf and/or their agents and/or employees, alleged herein, are illegal and violate the constitutional rights of Plaintiffs as to each applicable count. Plaintiffs also seek a declaration that each individual Plaintiff's detention was unjustified, unconstitutional, unlawful and without probable cause to believe that he had any involvement in the September 11th terrorist attacks or other terrorist activity. Plaintiffs further seek an injunction compelling Defendants to return all personal identification, money and valuable personal items that were confiscated from them. In addition, Plaintiffs seek compensatory and punitive damages for themselves, and an award of costs, and reasonable attorneys' fees.

12. As a result of Defendants' misconduct, Plaintiffs suffered severe and permanent physical injuries, and severe emotional distress and humiliation. Plaintiffs now bring this lawsuit to redress these wrongs and to seek just and fair compensation.

## JURISDICTION AND VENUE

13. This action is brought pursuant to the First, Fourth, Fifth, and Sixth Amendments to the Constitution, customary international law, federal statutes, and treaty law as incorporated into federal common law and statutory law.

14. This court has jurisdiction under 28 U.S.C. §1331 (federal question jurisdiction) and 28 U.S.C. §§2201 and 2202 (the Declaratory Judgment Act), 28 U.S.C. §1350 (the Alien Tort Claims Act), and 28 U.S.C. § 1367.

15. Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. §1391(b) in that a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

16. This action is brought pursuant to Bivens, under the First, Fourth, Fifth, Sixth, and Eighth Amendments to the United States Constitution, 28 U.S.C. §1350, 42 U.S.C. §§ 1985(3) and 2000bb, and N.Y.C. Code § 8-502.

## THE PARTIES

17. The plaintiffs SILVAN KURZBERG, PAUL KURZBERG, YARON SHMUEL, and OMER GAVRIEL MARMARI are male citizens and residents of the State of Israel, a nation which is a close ally of the Untied States, and are Jews. As Israelis and as Jews, plaintiffs themselves are sworn enemies of al-Qaeda and Osama bin-Laden, who are believed to have perpetrated the terrorist attacks on the United States on September 11, 2001. None of the plaintiffs has ever been an enemy of the United States, nor has any of the plaintiffs ever been a member of any organization that is an enemy of the United States.

18.    On September 11, 2001, each of the plaintiffs was in the United States and was arrested for immigration violations, and was thereafter detained for a protracted time by the defendants, who subjected them to excessively harsh conditions and violated their rights.

19.    Defendant JOHN ASHCROFT is the Attorney General of the United States. As Attorney General, Defendant Ashcroft has ultimate responsibility for the implementation and enforcement of the immigration laws. He is a principal architect of the policies and practices challenged here. Upon information and belief, he also authorized, condoned, and/or ratified the unreasonable and excessively harsh conditions under which Plaintiffs were detained. Defendant Ashcroft is being sued in his individual capacity.

20.    Defendant ROBERT MUELLER is the Director of the Federal Bureau of Investigation. Defendant Mueller was instrumental in the adoption, promulgation and implementation of the policies and practices challenged here. Upon information and belief, he also authorized, condoned, and/or ratified the unreasonable and excessively harsh conditions under which Plaintiffs were detained. Defendant Mueller is being sued in his individual capacity.

21.    Defendant JAMES W. ZIGLAR is the former Commissioner of the INS. As INC Commissioner, Defendant Ziglar had immediate responsibility for the implementation and enforcement of the immigration laws. He is the INS' chief executive officer. Defendant Ziglar was instrumental in the adoption, promulgation, and implementation of the policies and practices challenged here. Upon information and belief, he also authorized, condoned and/or ratified the unreasonable and excessively harsh conditions under which Plaintiffs have been detained. Defendant Ziglar is being sued in his individual capacity.

22.    Defendant DENNIS HASTY, until very recently, was the Warden of the MDC. While warden, Defendant Hasty had immediate responsibility for the conditions under which Plaintiffs were confined at the MDC. While Warden, Defendant Hasty subjected Plaintiffs confined at the MDC to unreasonable and excessively harsh conditions in violation of

the Constitution and international law norms. Defendant Hasty is being sued in his individual capacity.

23. Defendant MICHAEL ZENK is currently the warden of the MDC. As Warden, Defendant Zenk has immediate responsibility for the conditions under which Plaintiffs were confined at the MDC. On information and belief, as Warden, Defendant Zenk subjected Plaintiffs confined at the MDC to unreasonable and excessively harsh conditions in violation of the Constitution and international law norms. Defendant Zenk is being sued in his individual capacity.

24. Defendant KATHLEEN HAWK SAWYER was at all relevant times the Director of the Federal Bureau of Prisons. As such, Defendant SAWYER was responsible for the custody, care and control of the individuals detained in the MDC, including Plaintiffs, and was instrumental in the adoption, promulgation, and implementation of the policies and practices challenged here. She authorized, condoned and/or ratified the unreasonable and excessively harsh conditions under which Plaintiffs were detained.

25. Defendant LINDA THOMAS is the former Associate Warden of Programs of the MDC and was at all relevant times the Associate Warden of Programs of the MDC. While Associate Warden, Defendant THOMAS was responsible for the terms and conditions under which Plaintiffs were confined at the MDC, and for supervising, hiring, and training officers who brutalized and mistreated Plaintiffs. As Associate Warden, Defendant THOMAS subjected Plaintiffs to unreasonable and excessively harsh conditions.

26. Defendant KEVEN LOPEZ is and was at all relevant times a federal corrections officer employed at the MDC who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

27. Defendant S. CHASE, whose first name is unknown, is and was at all relevant times a federal corrections officer employed at the MDC who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

28.    Defendant "JORDAN" (believed to be an employee of the Federal Bureau of Prisons, whose true first and last names are unknown to the plaintiffs, who believe they heard him being called "Jordan") is and was at all relevant times a federal corrections officer employed at the MDC who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

29.    Defendant MARIO MACHADO is and was at all relevant times a federal corrections officer employed at the MDC who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

30.    Defendant WILLIAM BECK is and was at all relevant times a federal corrections officer employed at the MDC who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

31.    Defendant SALVATORE LOPRESTI is and was at all relevant times a federal corrections officer employed at the MDC who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

32.    Defendant STEVEN BARRERE is and was at all relevant times a federal corrections officer employed at the MDC who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

33.    Defendant RICHARD DIAZ is and was at all relevant times a federal corrections officer employed at the MDC who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

34.    Defendant C. SHACKS, whose first name is unknown to the plaintiffs, is and was at all relevant times a federal corrections officer employed at the MDC who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

35.    Defendant CHRISTPHOR WITSCHEL is and was at all relevant times a federal corrections officer employed at the MDC who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

36.     Defendant F. JOHNSON, whose first name is unknown to the plaintiffs, is and was at all relevant times a federal corrections officer employed at the MDC who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

37.     Defendant MICHAEL DEFRANCISCO is and was at all relevant times a federal corrections officer employed at the MDC who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

38.     Defendant J. MIELES, whose first name is unknown to the plaintiffs, is and was at all relevant times a federal corrections officer employed at the MDC who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

39.     Defendant JON OSTEEN is and was at all relevant times a federal corrections officer employed at the MDC who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

40.     Defendant M. ROBINSON, whose first name is unknown to plaintiffs, is and was at all relevant times a federal corrections officer employed at the MDC who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

41.     Defendant ROBINSON, whose first name is unknown to plaintiffs, is and was at all relevant times a federal corrections officer employed at the MDC who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

42.     Defendant ELIZABETH TORRES, whose first name is unknown to plaintiffs, is and was at all relevant times a federal corrections officer employed at the MDC who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

43.     Defendant HOSAIN, whose first name is unknown to plaintiffs, is and was at all relevant times a federal corrections officer employed at the MDC who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

44.     Defendant MOUNBO, whose first name is unknown to plaintiffs, is and was at all relevant times a federal corrections officer employed at the MDC who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

45.     Defendant NORMAN, whose first name is unknown to plaintiffs, is and was at all relevant times a federal corrections officer employed at the MDC who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

46.     Defendant MOSCHELLO, whose first name is unknown, is and was at all relevant times a federal corrections officer employed at the MDC who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

47.     Defendant Lieutenant BUCK, whose first name is unknown to plaintiffs, is and was at all relevant times a federal corrections officer employed at the MDC. Defendant BUCK subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

48.     Defendant T. CUSH, whose first name is unknown to plaintiffs, is and was at all relevant times a federal corrections officer employed at the MDC, who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

49.     Defendant GUSS, whose first name is unknown to plaintiffs, is and was at all relevant times a federal corrections officer employed at the MDC who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

50.     Defendant D. ORTIZ, whose first name is unknown to plaintiffs, is and was at all relevant times a federal corrections officer employed at the MDC, who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

51.     Defendant J. PEREZ, whose first name is unknown to plaintiffs, is and was at all relevant times a federal corrections officer employed at the MDC who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

52.     Defendant BIRAR, whose first name is unknown to plaintiffs, is and was at all relevant times a federal corrections officer employed at the MDC who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

53.     Defendant C. SHACKS, whose first name is unknown to plaintiffs, is and was at all relevant times a federal corrections officer employed at the MDC who was the Unit Manager for the ADMAX SHU and SHACKS subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

54.     Defendant RAYMOND COTTON, whose first name is unknown to plaintiffs, is and was at all relevant times a corrections counselor employed at the MDC who subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

55.     Defendants JOHN DOES 1-30 are federal employees who are employed as corrections officers at the MDC. Singly and collectively, Defendants John Does 1-30 have subjected Plaintiffs confined at the MDC to unreasonable and excessively harsh conditions. Defendants John Does 1-30 are being sued in their individual capacities.

56.     Defendants JOHN ROES 1-30 are federal law enforcement agents who are employed by the FBI or the INS. Singly and collectively, Defendants John Roes 1-30 have subjected Plaintiffs to coercive and involuntary custodial interrogation. Defendants John Roes 1-30 are being sued in their individual capacities.

57.     The defendants named herein by the fictitious names John Doe and John Roe are identified herein with sufficient specificity to toll the statute of limitations for any claims as against them.

58.     The defendants named herein by the fictitious names John Doe and John Roe are united in interest with the other defendants named herein such that the filing of this action tolls the statute of limitations against them.

59.     The defendants named herein by the fictitious names John Doe and John Roe wrongfully detained the plaintiffs and deprived them of their liberty and access to counsel,

all the while failing to identify themselves to the plaintiffs by name and even depriving at least one of the plaintiffs of his eyeglasses so that he could not even see the people who were detaining him, all as alleged elsewhere herein and incorporated into this paragraph by reference, and by reason whereof these defendants are equitably estopped from alleging the statute of limitations as a defense in this action.

        60.    All Defendants named herein acted under color of federal law.

## STATEMENT OF FACTS

### *General Allegations*

        61.    In the wake of the September 11th terrorist attacks, the INS arrested and detained well over 1,200 male, non-citizens from the Middle East, South Asia, and elsewhere, who appeared to be Arab or Muslim, or perversely, Israeli, most of them on minor immigration violations—such as overstaying visas, working illegally on tourist visas, or failing to meet matriculation and/or course work requirements for student visas. While the INS has sometimes in the past sought to remove non-citizens for these violations, it generally has not detained them during their removal proceedings.

        62.    Upon information and belief, the INS took a different approach with post-9/11 detainees, not because they violated the immigration laws—that alone does not justify detention under the immigration laws—but rather because federal law enforcement authorities deemed them potential (but not actual or even probable) terrorists, often based on vague suspicions rooted in racial, religious, ethnic, and/or national origin stereotypes rather than in hard facts.

        63.    Upon information and belief, many post-9/11 detainees were held for weeks, even months in INS facilities or county jails, without any charges being field against them and without any hearing on the reasons for their detention. Eventually, the INS filed charges against most post-9/11 detainees, alleging that they committed minor immigration violations and not criminal offenses.

64.    Upon information and belief, many post-9/11 detainees received final removal orders or accepted voluntary departure orders. Even though the INS could have promptly secured the removal or voluntary departure of these individuals, it kept them in custody in some cases over six months after the issuance of their final immigration orders—far longer than necessary to secure their removal or voluntary departure from the United States, and well beyond the time that the INS is statutorily authorized to detain them. 8 U.S.C. 1231(a)(1) (90-day removal period); 8 U.S.C. 1229c(b)(2) (60-day period for voluntary departure granted at the conclusion of removal proceedings).

65.    Upon information and belief, most, if not all, post-911 detainees were kept in custody after the issuance of final removal or voluntary departure orders until they have received two clearances—one from the FBI and the other from INS—absolving them of any linkage to terrorists or terrorist activities. In effect, federal law enforcement authorities deemed post-9/11 detainees guilty of terrorism until cleared, instead of innocent until proven guilty. The FBI and INS clearances have frequently taken four months or longer.

66.    Upon information and belief, from the outset, the arrest, processing, and detention of post-9/11 detainees were shrouded in extreme secrecy. Most were held incommunicado for the first few weeks of their detention. Family members thus initially had great difficulty finding out whether their loved ones had been arrested and detained, and if so, where they were being held. To add to the secrecy, the INS designated post-9/11 detainees as special interest cases which has the effect of closing their immigration hearings, not only to the general public but also to family members, and sealing the records in their cases.

67.    Upon information and belief, while in INS custody, most post-9/11 detainees were repeatedly interrogated by both the FBI and INS agents. Very few were represented by counsel during these interrogations. Many were not even told of their right to counsel. Others were coerced to waive that right, even though they could not read the printed English language on the waiver forms which they were instructed to sign and even though they

did not fully understand the nature of the right being waived. When post-9/11 detainees asked to adjourn interrogations so they can consult with an attorney, FBI and INS agents generally refused to do so.

68.     Upon information and belief, post-9/11 detainees had great difficulty obtaining legal representation, even after they were no longer held incommunicado. Some post-9/11 detainees were held for months following their arrest, with their status and whereabouts unknown to their lawyers and their families. Others were moved to different facilities without their lawyers' knowledge. For several months after the September 11th terrorist attacks, post-9/11 detainees held at the MDC were allowed to make only one call per month to their attorneys and only one call per month to their families. At both the MDC and the Passaic County Jail, post-9/11 detainees are allowed to make only collect calls, which few law offices accept from strangers. While INS detainees typically receive a list of organizations that might provide free legal services, the lists given to post-9/11 detainees have been woefully inadequate, containing much inaccurate and outdated information.

69.     Upon information and belief, while civil liberties, civil rights, and immigrant advocacy organization were ready, willing, and able to provide free legal services to post-9/11 detainees, Defendants Ashcroft, Mueller, Ziglar, Hasty, Zenk and their employees, agents, and contractors substantially limited such organizations' access to post-9/11 detainees. They imposed a virtual blackout on information on post-9/11 detainees, refusing to disclose their names, the facilities in which they are being held, or information about their cases. They also denied requests by civil liberties, civil rights, and immigrant advocacy organizations to visit INS facilities or county jails to screen post-9/11 detainees in need of legal assistance.

70.     Upon information and belief, even though non-citizen INS detainees must be advised of their right to seek assistance from their consulates under Article 36 of the Vienna Convention on Consular Relations, April 24, 1963, TIAS 6820, 21 U.S.T. 77 ("Vienna Convention"), many post-9/11 detainees were advised of this right. Others were coerced to

waive that right, even though they cannot read the printed English language on the waiver forms which they are asked to sign and do not understand the nature of the right being waived. When post-9/11 detainees sought to contact their consulates, their requests were denied.

71.    Upon information and belief, shortly after the September 11th terrorist attacks, Defendants Ashcroft, Mueller, and Ziglar adopted, promulgated and implemented policies within the INS and the FBI to detain men of Middle Eastern origin as suspects in a criminal investigation, notwithstanding the fact that in many instances they lacked probable cause to do so, in violation of the Fourth Amendment. To accomplish this goal, Defendants used the pretext of violations of the INA to detain Plaintiffs for criminal purposes. The circumstances of most of these detentions deviated from standard INS practice in the following respects:

    (a)    nearly all of the detainees were men of Middle Eastern or South Asian origin;

    (b)    nearly all were arrested and detained for minor immigration violations and on scant evidence of dangerousness or flight risk;

    (c)    nearly all were often held for more than 48 hours without notice of the charges against them;

    (d)    nearly all were denied bond; and

    (e)    nearly all were held in detention without cause for as long as six months after their final deportation or voluntary departure orders could have been carried out.

72.    Even though Plaintiffs were detained indefinitely for the purposes of a criminal investigation, Defendants deliberately denied them the mandatory constitutional, statutory, and common law protections afforded criminal defendants, including access to the courts, by, among other things:

    (a)      failing to comply with the requirement that a detained suspect in a criminal investigation be brought promptly before an independent magistrate for a probable cause determination;

    (b)      precluding them from obtaining legal representation by holding them incommunicado and refusing access to legal services and civil rights organizations that would have provided legal assistance;

    (c)      subjecting them to coercive interrogation, while in detention, despite repeated requests for adjournment to contact counsel;

    (d)      subjecting them to outrageous, excessive, cruel, inhuman, and degrading conditions of confinement, and excessive force; and

    (e)      coercing them to waive their right to consular access.

73.    Defendants adopted, promulgated, and implemented their detention policies, in whole or in part, based on invidious animus against foreigners of Middle Eastern origin, including Arabs and Muslims and, Perversely, Israelis, in violation of the First and Fifth Amendments to the Constitution. Such invidious animus is evidenced by, among other things:

    (a)      the above-mentioned unconstitutional policies have not been applied to all non-citizens in the United States alleged to have violated the immigration laws. Since the September 11th terrorist attacks, virtually all of these non-citizens arrested and detained on minor immigration violations have been Arab or Muslim or Middle Eastern or perceived to have been Arab or Muslim or Middle Eastern;

    (b)      they have been detained in situations where similarly situated non-Arabs and non-Muslims and non-Israelis have not been detained;

(c)     they have been detained beyond the time necessary to secure their removal or voluntary departure from the United States, while similarly situated non-Arab and non-Muslim and non-Israeli detainees have been removed or allowed to depart within a matter of days or weeks after final removal or voluntary departure orders have been issued;

(d)     they have been verbally abused and subjected to statements slandering their faith and their adherence to it by the Doe Defendants and by Defendant Ashcroft, who has expressed anti-Muslim sentiments, including a statement reportedly proclaiming the inferiority, moral and otherwise, of the Muslim people, to wit, Islam is a religion which God requires you to send your son to die for him. Christianity is a faith in which God sends his son to die for you; the plaintiffs are Israeli Jews, but the Defendants, out of racist ignorance, lumped them together with Arab Muslims; and

(e)     they have been targeted for disparate treatment by Defendant Ashcroft who announced the policy that Plaintiffs would be arrested and detained for any reason regardless of the *de minimis* nature of their infractions, and thereby eliminated for Plaintiffs any access to the fair and reasonable discretion of law enforcement officials. This fair and reasonable discretion remains available to non-Arab and non-Muslim and non-Middle Eastern individuals who are non-citizens. Defendant Ashcroft's policy announcement stated: "Let the terrorists among us be warned. If you overstay your visa even by one day, we will arrest you. If you

violate a local law we will…work to make sure that you are put in jail and…kept in custody as long as possible."

### *Inspector General's Report on the September 11 Detainees Held by INS*

74.    On June 2, 2003, the Office of the Inspector General of the United States Department of Justice released a 198-page report entitled "The September 11 Detainees: A Review of the Treatment of Aliens Held on Immigration Charges in Connection with the Investigation of the September 11 Attacks" ("OIG Report"). The OIG Report provides a wealth of details concerning the government's treatment of the post-9/11 detainees.

75.    According to the OIG Report, the INS consistently delayed in issuing and serving the post-9/11 detainees with charging documents (known as Notices to Appear or NTAs) far beyond the 48-hour period specified in its regulations at C.F.R. §287.3 for issuing an NTA and its post-9/11 goal of serving an NTA within 72 hours. (OIG Report at 29-30). In doing so, the INS has impaired the ability of detainees to know the charges on which they are being held, obtain legal counsel, and seek release on bond. (*Id.* at 35).

76.    According to the OIG Report, as a matter of custom and policy, Defendants instituted a blanket "no bond" policy for all individuals arrested in connection with September 11th investigations that was applied without regard to whether the person posed a flight risk or a danger. (*Id.* at 76, 78). INS District Directors were ordered to make an initial determination of no bond for all post-9/11 detainees. (*Id.* at 76-77). Moreover, Defendants ordered INS Trial Attorneys to seek continuances and delays of bond redetermination hearings and to oppose bond even when there was no evidence to support the denial of bond. (*Id.* at 78-80). All of the Plaintiffs were subjected to Defendants' blanket no bond policy.

77.    According to the OIG Report, many post-9/11 detainees were classified as "of high interest" to the Government's terrorism investigation without specific criteria or a uniform classification system. (*Id.* at 18). The FBI requested that the INS place these "of high interest" detainees at MDC. (*Id.*) Once assigned to MDC, the Bureau of Prisons ("BOP")

classified the detainees as "Witness Security" and/or "Management Interest Group 155" detainees without any individual assessment or uniform criteria of any sort. (*Id.* at 116-16). Upon information and belief, and according to the OIG Report, BOP regulations require an employee known as the Segregation Review Official to conduct a weekly review of the status of each inmate housed in the SHU after he (or she) has spent seven days in administrative detention or disciplinary segregation. (*Id.* at 118). The Segregation Review Official is also required to conduct a formal hearing every 30 days assessing the inmate's status. (*Id.*). These review processes were not conducted for the post-9/11 detainees. Officials at MDC were told by BOP headquarters that until the FBI had cleared a particular detainee, that detainee's report was to be automatically annotated with the phrase "continue high security," no hearing was to take place, and the detainee was to remain under restrictive detention in the ADMAX SHU. (*Id.*). Upon information and belief, Plaintiffs denied any review processes.

78.    These arbitrary and capricious classifications resulted in revere deprivations of liberty. The "of high interest" detainees were placed in the ADMAX SHU, a particularly restrict type of SHU uncommon to most BOP facilities because the normal SHUs "are usually sufficient for correcting inmate misbehavior and addressing security concerns." (*Id.* at 118-19). The ADMAX SHU at MDC was established after September 11, 2001 to make available more restrictive confinement. (*Id.* at 119). Unlike regular SHUs, ADMAX SHUs enforce four-man hold restraint policies, use hand-held cameras to record detainee movements, and have cameras in each cell to monitor detainees. (*Id.*). Unlike detainees in the general population at MDC, detainees in the ADMAX SHU were not allowed to move around the unit, use the telephone freely, nor were they permitted electronic equipment (such as small radios). (*Id.*). Instead, ADMAX SHU detainees could only move outside their cells while restrained and accompanied by four staff members, and only then for specific purposes. (*Id.*). ADMAX SHU detainees were strictly limited in their telephone use in terms of both frequency and duration of

calls. (*Id.*). Unlike the general MDC population, all attorney and family visits were non-contact, with a clear partition between the parties. (*Id.* at 123).

79.    According to the OIG Report, detainees at the ADMAX SHU in MDC were subjected to a communications blackout that barred them from receiving telephone calls, visitors, mail, or placing telephone calls. (*Id.* at 113). During this period, detainees were unable to make unrestricted contact with attorneys or their families. (*Id.* at 114). Compounding this situation, the detainees' classification as "Witness Security" and/or "Management Interest Group 155" led MDC to turn away lawyers and family members who came to the facility seeking individual detainees by falsely stated that the individuals were not detained inside. (*Id.* at 115).

80.    According to the OIG Report, the arbitrarily labeled "of high interest" detainees were placed in the ADMAX SHU and subjected to the communication blackout pursuant to a joint policy of the FBI, INS, and Bureau of Prisons. (*Id.* at 18). INS Commissioner Zigler, FBI Director Mueller, and Attorney General Ashcroft ordered and/or condoned the prolonged placement of these detainees in extremely restrictive confinement. (*Id.* at 17, 37-39, 66, 77).

81.    According to the OIG Report, the INS held detainees long after removal could have been effectuated, simply because the FBI had not completed its "clearance" process. As a matter of policy and practice, and in keeping with its "hold until cleared" policy, INS did not conduct post-order custody reviews for post-9/11 detainees held more than 90 days after their final removal orders. (*Id.* at 91, 107-108). These reviews are required by the INS regulations at 8 C.F.R. 241.4, and provide that detainees must be given 30 days notice of the review and that the INS complete the review 90 days after the issuance of a final removal order. On information and belief, Plaintiffs were not given notice of such a review and no such review was conducted.

82. In the months after September 11, 2001, the Federal Bureau of Investigation ("FBI") arrested and detained thousands of Arab Muslim men, designated herein as "post-September 11th detainees," as part of its investigation of the events of September 11.

83. Many of these men, including Plaintiffs, were classified as being "of high interest" to the government's post-September-11th investigation by the FBI without specific criteria or a uniform classification system.

84. In many cases, including Plaintiffs', the classification was made because of the race, religion, and national origin of the detainees, and not because of any evidence of the detainees' involvement in supporting terrorist activity.

85. Many post-September 11th detainees classified as being "of high interest" were confined at the MDC in Brooklyn, New York, in the ADMAX SHU, which is the Federal Bureau of Prisons' ("BOP") most restrictive type of confinement. The ADMAX SHU was quickly created on MDC's ninth floor to house post-September 11th detainees. Prior to September 11, 2001, the MDC had a SHU, but not an ADMAX SHU.

86. The MDC had as many as 60 detainees housed in the ADMAX SHU at one time.

87. The ADMAX SHU enforced a four-man hold restraint policy, the use of hand-held cameras to record detainee movements, cameras in each cell to monitor detainees, and physical security enhancements.

88. The MDC is a "place or provider of public accommodation" as that term is defined in N.Y.C. Code § 8-102(9).

89. Post-September 11th detainees in the ADMAX SHU were subjected to highly restrictive conditions of confinement. They were not permitted to move about the unit, use the telephone freely, nor were they permitted any electronic equipment in their cells, such as small radios. Post-September 11th detainees moved outside their cells only when they were restrained with handcuffs and leg irons and escorted by four staff members.

90.    Post-September 11th detainees in the ADMAX SHU were subjected to a communications blackout that barred them from receiving telephone calls, visitors, mail, and from placing telephone calls. During this period, which lasted many weeks, the post-September 11th detainees, including Plaintiffs, were unable to make any contact with their attorneys or families.

91.    Compounding this situation, MDC employees often turned away lawyers and family members who came to visit individual post-September 11th detainees by falsely stating that the individual detainee was no longer detained in the MDC.

92.    Markedly different from the conditions in the MDC 's general population, detainees in the ADMAX SHU were permitted to leave their cells for only one hour a day, at most, and their legal and social visits were non-contact, with a clear partition between the parties.

93.    Because of the highly restrictive nature of the ADMAX SHU, BOP regulations require an employee known as the Segregation Review Official to conduct a weekly review of the status of each inmate housed in the SHU after he has spent seven days in administrative detention or disciplinary segregation. The Segregation Review Official is also required to conduct a formal hearing every 30 days assessing the inmate's status.

94.    These review processes were never provided to the post-September 11th detainees, including Plaintiffs. Instead, the detainees were held in the ADMAX SHU until the FBI approved their release to the general population unit. Sometimes, detainees were held in the ADMAX SHU even after they were approved for release to the general population unit by the FBI.

95.    Until the FBI approved the release of a particular detainee, MDC policy was to automatically annotate the detainee status with the phrase "continue high security." The post-September 11th detainees were not afforded any hearings, and they remained under restrictive detention in the ADMAX SHU.

96.   Moreover, the FBI failed to approve post-September 11 detainees' release to general population based simply on the detainees' race, religion, and national origin, and not based on any evidence that continued detention in ADMAX SHU was relevant to the FBI's investigation of the events of September 11, 2001.

97.   While the plaintiffs were detained at the MDC in the ADMAX SHU by the defendants, they were subjected to many of the above conditions, and in addition the plaintiffs were subjected to the following conditions:

        (a)    Plaintiffs were deprived of food in advance of the Yom Kippur holiday, even though they advised the guards that they were required to fast on Yom Kippur;

        (b)    Plaintiffs were deprived of food after the Yom Kippur holiday, even though they had fasted for an entire day. Plaintiffs were told, in words or substance: "you fasted, its your problem.";

        (c)    Plaintiff Silvan Kurzberg was forced to provide a blood sample on Yom Kippur even though he advised the guards that he was fasting. He passed out as a result of the blood drawing and was left alone in a cell to recover;

        (d)    Plaintiffs were denied telephone access to their family because their family resided in Israel and only local calls were allowed;

        (e)    Plaintiffs were unable to obtain access to money for postage, telephone, etc., while in the MDC because the only way for them to put money in the prison account was to call their parents in Israel to ask for money to be sent but they could not call their parents in Israel without money in the prison account;

(f)    A guard said to plaintiff Yaron Shmuel, in words or substance, "I have connections with the inmates and I'll make sure they take care of you...Have you heard of Bubba?"

(g)    Plaintiff Yaron Shmuel was deprived of his eye glasses, without which he can hardly see;

(h)    Plaintiffs' counsel was told that the plaintiffs were not in the MDC when they were actually there.

(i)    Plaintiffs' access to counsel was severely limited;

(j)    Plaintiffs were not properly advised of their rights to consular access, and were limited in their consular access;

(k)    The plaintiffs were not deported even though they waived any hearing, consented to immediate deportation, and even had airplane tickets back to Israel'

(l)    Plaintiffs were denied medical attention, and were subjected to forced medication and medical testing;

(m)    Plaintiffs were kept in solitary confinement for almost two months, without any grounds for such confinement;

(n)    Plaintiffs were forced to undergo polygraph tests;

(o)    Plaintiffs were falsely accused by the defendants of having some involvement in the terrorist attacks of September 11, 2001, despite the utter absence of any evidence of such involvement;

(p)    Plaintiffs were repeatedly strip-searched;

(q)    Plaintiffs were deprived of common toiletries, such as toilet paper which was given out only a few pieces at a time, soap, and toothbrushes;

(r)    Plaintiffs were not provided sufficient quantities of food, and on some days the defendant Mario Machado would deliberately not provide the plaintiffs with food;

(s)    Plaintiffs were held in freezing cells, and were not permitted to use their blankets other than at night;

(t)    Plaintiffs were not provided with kosher food and were mocked for having requested it;

(u)    Plaintiffs were subjected to repeated interrogations without the benefit of counsel;

(v)    Plaintiffs were forced to sign that they had received a document setting forth their legal rights as prisoners, but were not actually given a copy of that document, and indeed were told that there was no point in their reading it because they had no rights;

(w)    Plaintiffs were provided with two postage stamps good for domestic mail only, even though plaintiffs' families were in Israel;

(x)    Plaintiffs were given an opportunity for outdoor recreation in the freezing cold, but were not provided with coats or permitted to take their blankets with them;

(y)    Plaintiffs were disciplined for attempting to pray in their cells. Plaintiff Yaron Shmuel was forced out of his cell, thrown against walls, and placed in a cell without a mattress, sheets, or blanket, as a punishment for having prayed out loud;

(z)    Plaintiffs were not permitted to meet with a Rabbi, and even after they later were permitted to meet with the Rabbi their access to the Rabbi was severely limited;

(aa)    Plaintiffs were disciplined and berated for having advised the
Israeli Consul how they were being treated by the defendants,
which apparently had led to an official letter of complaint from
the Israeli Consulate;

(bb)    The defendant guards would kick the plaintiffs' cell doors in the
middle of the night, waking the plaintiffs and depriving them of
sleep;

(cc)    Plaintiffs were subjected to racial, ethnic, and anti-Semitic slurs;

(dd)    Plaintiff Yaron Shmuel was placed in a cell with an Algerian
Moslem inmate, despite the known hostilities between
Arabs/Moslems and Jewish Israelis;

(ee)    The defendant guards confiscated prayer books and a bible
brought by the Rabbi for "inspection";

(ff)    The Israeli Consulate reported to the plaintiffs that they had tried
to meet with the plaintiffs for two weeks, during which the FBI
had refused to allow them access;

(gg)    One of the defendant guards told the plaintiff Yaron Shmuel that
he should commit suicide because "we need to kill all the Jews."

(hh)    The plaintiffs were often beaten by the defendant guards,
including cuffing hands behind the plaintiffs' backs, twisting
arms, kicks to the ribs; and sitting on the plaintiffs while they lay
on a metal bed;

(ii)    The plaintiffs were subjected to a game that the defendant guards
called "Ping Pong", in which the guards would throw inmates
between each other and against walls.

98.    Though there were handheld video cameras that were sometimes used, the defendant guards would make a game out of finding ways to abuse the plaintiffs while off camera or in ways that looked ambiguous on camera.

*Interference with Right to Counsel*

99.    Defendant COTTON was the counselor for the ADMAX SHU and determined whether and when detainees were permitted visitation or phone calls.

100.    While in the ADMAX SHU, Plaintiffs' communication with their legal counsel was substantially interfered with by Defendants COTTON and SHACKS.

101.    Defendants HASTY, ZENK, THOMAS, COTTON and SHACKS each knew of and condoned the imposition of substantial restrictions on Plaintiffs' right to communicate with counsel.

102.    The imposition of these restrictions was all pursuant to the customs and practices of the MDC. Such unlawful customs and practices were known or should have been known to Defendants HASTY, ZENK, and THOMAS, who with deliberate indifference to and/or reckless disregard for the risk of failing to take remedial action, subsequently failed to institute, create, or enforce reasonable policies or procedures to curtail such unlawful activity.

103.    Defendants HASTY, ZENK, THOMAS, and SHACKS knew of or should have known of the propensity of their subordinates to substantially interfere with Plaintiffs' right to counsel, and Defendants HASTY, ZENK, THOMAS, and SHACKS, with deliberate indifference to and/or reckless disregard for the risk of failing to take remedial action, subsequently failed to institute, create, or enforce reasonable policies or procedures to curtail such unlawful activity.

104.    Plaintiffs' right to communicate with counsel was interfered with because of their race, religion, and/or national origin.

105.    As a result of Defendants' actions, Plaintiffs suffered extreme emotional distress.

*General Allegations*

106.     Defendants LOPEZ, CHASE, JORDAN, MACHADO, BECK, DIAZ, SHACKS, LOPRESTI, BARRERE, OSTEEN, MIELES, DEFRANCISCO, JOHNSON, WITSCHEL, MOSCHELLO, HOSAIN, MOUNBO, ROBINSON, TORRES, COTTON, LORENZON, BIRAR, BUCK, CUSH, GUSS, ORTIZ, PEREZ, SHACKS, AND DOE Defendants NOS. 1-30 each knew of, participated in, and willfully and maliciously subjected Plaintiffs to the mistreatment described herein.

107.     Defendants LOPEZ, CHASE, JORDAN, MACHADO, BECK, DIAZ, SHACKS, LOPRESTI, BARRERE, OSTEEN, MIELES, DEFRANCISCO, JOHNSON, WITSCHEL, MOSCHELLO, HOSAIN, MOUNBO, ROBINSON, TORRES, COTTON, LORENZON, BIRAR, BUCK, CUSH, GUSS, ORTIZ, PEREZ, SHACKS, AND DOE Defendants NOS. 1-30were aware of, approved of, and willfully and maliciously created these unlawful conditions of confinement.

108.     The repeated beatings and mistreatment of Plaintiffs were pursuant to the policy and practice of the MDC. Such unlawful customs and practices were known or should have been known to Defendants HASTY, ZENK, and THOMAS, who with deliberate indifference to and/or reckless disregard for the risk of failing to take remedial action, subsequently failed to institute, create, or enforce reasonable policies or procedures to curtail such unlawful activity.

109.     Defendants HASTY, ZENK, THOMAS, and SHACKS knew of or should have known of the propensity of their subordinates to subject Plaintiffs to the beatings and other mistreatment described herein, and Defendants HASTY, ZENK, THOMAS, and SHACKS, with deliberate indifference to and/or reckless disregard for the risk of failing to take remedial action, subsequently failed to institute, create, or enforce reasonable policies or procedures to curtail such unlawful activity.

110.    Defendants specifically targeted Plaintiffs for mistreatment because of Plaintiffs' race, religion, and/or national origin.

111.    Defendants' conduct imposed an undue burden on Plaintiffs' sincere religious belief and practice.

112.    As a result of Defendants' malicious, willful, and unlawful conduct, Plaintiffs suffered severe and permanent physical injuries and severe emotional distress.

## FIRST CLAIM FOR RELIEF
### (Fourth Amendment: Seizure)

113.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

114.    In detaining Plaintiffs longer than necessary to secure their removal or voluntary departure from the United States without charging them with any crime and without affording them a hearing before a neutral judicial officer to determine whether there was probable cause to justify their continued detention, Defendants, acting under color of law and their authority as federal officers, have intentionally or recklessly seized Plaintiffs in violation of the Fourth Amendment to the Constitution.

115.    Plaintiffs have no effective means of enforcing their Fourth Amendment rights other than by seeking declaratory and other relief from the Court.

116.    As a result of Defendants' unlawful conduct, Plaintiffs suffered emotional distress, humiliation, embarrassment, and monetary damages.

## SECOND CLAIM FOR RELIEF
### (Fifth Amendment: Due Process)

117.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

118.    In detaining Plaintiffs longer than necessary to secure their removal or voluntary departure from the United States without any legitimate immigration law

enforcement purpose, and without evidence that they posed a danger or flight risk, Defendants, acting under color of law and their authority as federal officers, intentionally or recklessly subjected Plaintiffs to arbitrary and capricious detention, taking their liberty without due process of law in violation of the Fifth Amendment to Constitution.

119.    Plaintiffs have no effective means of enforcing their Fifth Amendment due process rights other than by seeking declaratory and other relief from the Court.

120.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered emotional distress, humiliation, embarrassment, and monetary damages.

## THIRD CLAIM FOR RELIEF
### (Fifth Amendment: Due Process)

121.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

122.    By adopting, promulgating, and implementing the policy and practice under which Plaintiffs were unreasonably detained and subjected to outrageous, excessive, cruel, inhuman and degrading conditions of confinement, Defendants, acting under color of law and their authority as federal officers, have intentionally or recklessly deprived Plaintiffs of their liberty interests without due process of law in violation of the Fifth Amendment to the Constitution.

123.    Plaintiffs have no effective means of enforcing their Fifth Amendment due process rights other than by seeking declaratory and other relief from the Court.

124.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered emotional distress, humiliation, embarrassment, and monetary damages.

## FOURTH CLAIM FOR RELIEF
### (Fifth Amendment: Due Process)

125.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

126.    By adopting, promulgating, and implementing the policy and practice under which Plaintiffs were subjected to coercive and involuntary custodial interrogation designed to overcome their will and coerce involuntary and incriminating statements from them, Defendants acting under color of law and their authority as federal officers, have intentionally or recklessly violated the rights of Plaintiffs to due process of law under the Fifth Amendment to the Constitution.

127.    Plaintiffs have no effective means of enforcing their Fifth Amendment due process rights other than by seeking declaratory and other relief from the Court.

128.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered emotional distress, humiliation, embarrassment, and monetary damages.

### FIFTH CLAIM FOR RELIEF
### (Fifth Amendment: Equal Protection)

129.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

130.    In detaining Plaintiffs longer than necessary to secure their removal from the United States and subjecting them to harsh treatment not accorded similarly-situated non-citizens, Defendants, acting under color of law and their authority as federal officers, have singled out Plaintiffs based on their race, religion, and/or ethnic or national origin, and intentionally violated their rights under the Fifth Amendment to the Constitution to equal protection of the law.

131.    Plaintiffs have no effective means of enforcing their Fifth Amendment equal protection rights other than by seeking declaratory and other relief from the Court.

132.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered emotional distress, humiliation, embarrassment, and monetary damages.

## SIXTH CLAIM FOR RELIEF
### (Sixth Amendment: Right to a Speedy Trial)

133.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

134.    Defendants adopted, promulgated, and implemented policies under which plaintiffs were arrested and held for extensive periods of time in what is tantamount to criminal detention without the filing of any indictment, information, or other formal criminal charge, and were not brought to trial within a reasonable period of time, resulting in oppressive and lengthy pretrial incarcerations. In doing so, Defendants have intentionally or recklessly deprived Plaintiffs of their right under the Sixth Amendment to a speedy trial.

135.    Plaintiffs have no effective means of enforcing their right to a speedy trial that is guaranteed to them by the Sixth Amendment other than by seeking declaratory and other relief from the Court.

136.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered emotional distress, humiliation, embarrassment, and monetary damages.

## SEVENTH CLAIM FOR RELIEF
### (First Amendment: Free Exercise of Religion)

137.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

138.    Defendants adopted, promulgated, and implemented policies and practices intended to deny Plaintiffs the ability to practice and observe their religion. These policies and practices have included, among other things, the visitation of verbal and physical abuse upon Plaintiffs, and the deliberate denial of all means by which they could maintain their religious practices, including their observance of Kosher food, daily prayer requirements and holiday observance. By such mistreatment, Defendants, acting under color of law and their authority as federal officers, intentionally or recklessly violated Plaintiffs' right to free exercise of religion guaranteed to them under the First Amendment to the Constitution.

139.    Plaintiffs have no effective means of enforcing their First Amendment rights other than by seeking declaratory and other relief from the Court.

140.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered emotional distress, humiliation, embarrassment, and monetary damages.

## EIGHTH CLAIM FOR RELIEF
### (Fifth Amendment: Confiscation of Personal Property)

141.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

142.    Defendants adopted, promulgated, and implemented a policy and practice of deliberately depriving Plaintiffs of their personal property without providing them with a remedy to recover that property. Defendants refused to return to Plaintiffs, at the time of their removal or voluntary departure from the United States, the personal identification, money, and other valuable personal items that Defendants confiscated from Plaintiffs upon arrest. In doing so, Defendants, acting under color of law and their authority as federal officers, intentionally violated Plaintiffs' right to due process of law under the Fifth Amendment to the United States Constitution.

143.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

144.    Plaintiffs have no effective means of enforcing their Fifth Amendment rights other than by seeking declaratory and other relief from the Court.

145.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered emotional distress, humiliation, embarrassment, and monetary damages.

## NINTH CLAIM FOR RELIEF
### (Customary International Law: Arbitrary Detention)

146.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

147. The acts described herein constitute arbitrary detention of Plaintiffs in violation of the law of nations under the Alien Tort Claims Act, 28 U.S.C. §1350, in that the acts violated customary international law prohibiting arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international and domestic judicial decisions, and other authorities.

148. Defendants are liable for said conduct in that they, acting under color of law and their authority as federal officers, have directed, ordered, confirmed, ratified, and/or conspired in bringing about the arbitrary detention of Plaintiffs.

149. As a result of Defendants' unlawful conduct, Plaintiffs were deprived of their freedom, separated from their families and forced to suffer severe physical and mental abuse, and are entitled to monetary damages.

### TENTH CLAIM FOR RELIEF
### (Customary International Law: Cruel, Inhuman, or Degrading Treatment)

150. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

151. The acts described herein had the intent and the effect of grossly humiliating and debasing the Plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish, and break their physical or moral resistance.

152. The acts described herein constitute cruel, inhuman or degrading treatment in violation of the law of nations under the Alien Tort Claims Act, 28 U.S.C. §1350, in that the acts violated customary international law prohibiting cruel, inhuman or degrading treatment as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

153. Defendants are liable for said conduct in that Defendants, acting under color of law and their authority as federal officers, directed, ordered, confirmed, ratified, and/or conspired to cause the cruel, inhuman or degrading treatment of Plaintiffs.

154.    All Plaintiffs were forced to suffer severe physical and psychological abuse and agony and are entitled to monetary damages.

### ELEVENTH CLAIM FOR RELIEF
### (Vienna Convention on Consular Relations: Consular Notification)

155.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

156.    Plaintiffs were not timely notified by arresting authorities of their right to communicate with consular officials as required by the Vienna Convention on Consular Relations, April 24, 1963, TIAS 6820, 21 U.S.T. 77, Art. 36

157.    Defendants further violated Plaintiffs' Vienna Convention rights by failing to respond to their requests without delay and timely notify the consular posts of their detention. Vienna Convention, Art. 36(1).

158.    Violations of the right to consular access are direct treaty violations, as specified above, and are also violations of customary international law.

159.    As a result of Defendants' unlawful conduct, Plaintiffs are entitled to monetary damages.

### TWELFTH CLAIM FOR RELIEF
### (Excessive Force)

160.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

161.    The intentional beatings of Plaintiffs by Defendants John Does 1-30 when Plaintiff was unarmed and did not pose a threat of death or grievous bodily injury to Defendants or others, and when Defendants had not lawful authority to use deadly or non-deadly force against him, was without justification or provocation, was excessive, and was done with actual malice toward Plaintiff and with willful and wanton indifference to and deliberate disregard for the constitutional rights of Plaintiff.

162.     The intentional beatings of Plaintiffs by Defendants John Does 1-30 violated Plaintiffs' rights as guaranteed by the Fourth and Fifth Amendments to the Constitution, for which such officers are individually liable.

163.     As a proximate result of the beatings by Defendants John Does 1-30, Plaintiffs have sustained permanent injuries and incurred medical bills and other expenses. These injuries have caused and will continue to cause him great pain and suffering, both mental and physical.

164.     As a result of the unlawful conduct of Defendant John Does 1-30, Plaintiffs are entitled to monetary damages.

## THRITEENTH CLAIM FOR RELIEF
### (Delays in Serving Charging Documents – Fifth Amendment: Due Process)

165.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

166.     In delaying the issuance and service of charging documents (known as Notices to Appear) on the post-9/11 detainees, Defendants impaired the ability of the detainees to know the charges on which they are being held, obtain legal counsel, and seek release on bond. Further, Defendants, acting under color of law and their authority as federal officers, have intentionally or recklessly deprived Plaintiffs of their due process rights under the Fifth Amendment to the Constitution.

167.     Plaintiffs have no effective means of enforcing their Fifth Amendment rights other than by seeking declaratory and other relief from the Court.

168.     As a result of Defendants' unlawful conduct, Plaintiffs have suffered emotional distress, humiliation, embarrassment, and monetary damages.

## FOURTEENTH CLAIM FOR RELIEF
### (Blanket No Bond Policy—Fifth Amendment: Due Process)

169.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

170.    Defendants applied a blanket no bond policy to all post-9/11 detainees without regard to whether the detainee posed a flight risk or a danger and thereby deprived Plaintiffs of their right under the Fifth Amendment's Due Process Clause not to be detained arbitrarily in the absence of any finding or evidence that they posed a danger or flight risk.

171.    Plaintiffs have no effective means of enforcing their Fifth Amendment rights other than by seeking declaratory and other relief from the Court.

172.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered emotional distress, humiliation, embarrassment, and monetary damages.

## FIFTEENTH CLAIM FOR RELIEF
### (Blanket No Bond Policy—Fifth Amendment: Equal Protection)

173.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

174.    Defendants applied a blanket no bond policy to all post-9/11 detainees without regard to whether the detainee posed a flight risk or a danger. Defendants arrested and denied bond to "of high interest" detainees on little or no evidence of terrorist connections but instead due to their ethnic or religious identity in violation of their right to equal protection of the laws under the Fifth Amendment's Due Process Clause. Thus, Defendants intentionally or recklessly violated rights guaranteed to Plaintiffs by the Fifth Amendment to the United States Constitution.

175.    Plaintiffs have no effective means of enforcing their Fifth Amendment rights other than by seeking declaratory and other relief from the Court.

176.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered emotional distress, humiliation, embarrassment, and monetary damages.

## SIXTEENTH CLAIM FOR RELIEF
### (Assignment to SHU — Fifth Amendment: Due Process)

177.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

178.    By adopting, promulgating, and implementing the policy and practice under which Plaintiffs were classified as "of high interest," "Witness Security," and/or "Management Interest Group 155" detainees in an arbitrary and unreasonable manner, without any defined criteria, individualized assessment of dangerousness or risk of flight, contemporaneous review, or process of any sort, and by which classifications Plaintiffs experienced unnecessary and unreasonable restrictions on their liberty, Defendants, acting under color of law and their authority as federal officers, have intentionally or recklessly violated the rights of Plaintiffs to procedural due process of law under the Fifth Amendment to the United States Constitution.

179.    Plaintiffs have no effective means of enforcing their Fifth Amendment rights other than by seeking declaratory and other relief from the Court.

180.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered emotional distress, humiliation, embarrassment, and monetary damages.

## SEVENTEENTH CLAIM FOR RELIEF
### (Communications Blackout and Interference
### with Counsel - First Amendment)

181.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

182.    By adopting or promulgating, and implementing the policy and practice under which Plaintiffs were subjected to a "communication blackout" and other measures while in detention that interfered with their access to lawyers and the courts, Defendants intentionally or recklessly violated Plaintiffs' rights to obtain access to legal counsel and to

petition the courts for redress of their grievances, in violation of their rights under the First Amendment of the United States Constitution.

183.    Plaintiffs have no effective means of enforcing their First Amendment rights other than by seeking declaratory and other relief from the Court.

184.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered emotional distress, humiliation, embarrassment, and monetary damages.

## EIGHTEENTH CLAIM FOR RELIEF
### (Communications Blackout and Interference with Counsel - Fifth Amendment: Due Process)

185.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

186.    By adopting, promulgating, and implementing the policy and practice under with Plaintiffs were subjected to a "communications blackout" and other measures while in INS detention that interfered with their access to lawyers and the courts, Defendants intentionally or recklessly violated Plaintiffs' rights to obtain access to legal counsel and to petition the courts for redress of their grievances, in violation of their rights under the Due Process Clause of the Fifth Amendment to the United States Constitution.

187.    Plaintiffs have no effective means of enforcing their Fifth Amendment rights other than by seeking declaratory and other relief from the Court.

188.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered emotional distress, humiliation, embarrassment, and monetary damages.

## NINETEENTH CLAIM FOR RELIEF
### (Fifth Amendment: Due Process - Custodial Interrogations)

189.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

190.    By adopting, promulgating, and implementing the policy and practice under which Plaintiffs were subjected to coercive and involuntary custodial interrogation

designed to overcome their will and coerce involuntary and incriminating statements from them, Defendants, acting under color of law and their authority as federal officers, have intentionally or recklessly violated the rights of Plaintiffs to due process of law under the Fifth Amendment to the Constitution.

191.   Plaintiffs have no effective means of enforcing their Fifth Amendment due process rights other than by seeking declaratory and other relief from the Court.

192.   As a result of Defendants' unlawful conduct, Plaintiffs have suffered emotional distress, humiliation, embarrassment, and monetary damages.

## TWENTIETH CLAIM FOR RELIEF
### (Sixth Amendment: Right to a Speedy Trial )

193.   Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

194.   Defendants adopted, promulgated, and implemented policies under which plaintiffs were arrested and held for extensive periods of time in what is tantamount to criminal detention without the filing of any indictment, information, or other formal criminal charge, and were not brought to trial within a reasonable period of time, resulting in oppressive and lengthy pretrial incarcerations. In doing so, Defendants have intentionally or recklessly deprived Plaintiffs of their right under the Sixth Amendment to a speedy trial.

195.   Plaintiffs have no effective means of enforcing their right to a speedy trial that is guaranteed to them by the Sixth Amendment other than by seeking declaratory and other relief from the Court.

196.   As a result of Defendants' unlawful conduct, Plaintiffs have suffered emotional distress, humiliation, embarrassment, and monetary damages.

197.   Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

## TWENTY-FIRST CLAIM FOR RELIEF
### (First Amendment: Free Exercise of Religion)

198.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

199.    Defendants adopted, promulgated, and implemented policies and practices intended to deny Plaintiffs the ability to practice and observe their religion. These policies and practices have included, among other things, the visitation of verbal and physical abuse upon Plaintiffs, and the deliberate denial of all means by which they could maintain their religious practices, including their observance of Kosher food, daily prayer requirements, and holiday observance. By such mistreatment, Defendants, acting under color of law and their authority as federal officers, intentionally or recklessly violated Plaintiffs' right to free exercise of religion guaranteed to them under the first Amendment to the Constitution.

200.    Plaintiffs have no effective means of enforcing their First Amendment rights other than by seeking declaratory and other relief from the Court.

201.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered emotional distress, humiliation, embarrassment, and monetary damages.

## TWENTY-SECOND CLAIM FOR RELIEF
### (Fifth Amendment: Confiscation of Personal Property)

202.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

203.    Defendants adopted, promulgated, and implemented a policy and practice of deliberately depriving Plaintiffs of their personal property without providing them with a remedy to recover that property. Defendants refused to return to Plaintiffs at the time of their removal or voluntary departure from the United States, the personal identification, money, and other valuable personal items that Defendants confiscated from Plaintiffs upon arrest. In doing so, Defendants, acting under color of law and their authority as federal officers,

intentionally violated Plaintiffs' right to due process of law under the Fifth Amendment to the United States Constitution.

204.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

205.    Plaintiffs have no effective means of enforcing their Fifth Amendment rights other than by seeking declaratory and other relief from the Court.

206.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered emotional distress, humiliation, embarrassment, and monetary damages.

## TWENTY-THIRD CLAIM FOR RELIEF
### (Customary International Law: Arbitrary Detention)

207.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

208.    The acts described herein constitute arbitrary detention of Plaintiffs in violation of the law of nations under the Alien Tort Claims Act, 28 U.S.C. 1350, in that the acts violate customary international law prohibiting arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

209.    Defendants are liable for said conduct in that they, acting under color of law and their authority as federal officers, have directed, ordered, confirmed, ratified, and/or conspired in bringing about the arbitrary detention of Plaintiffs.

210.    As a result of Defendants' unlawful conduct, Plaintiffs were deprived of their freedom, separated from their families and forced to suffer severe physical and mental abuse, and are entitled to monetary damages.

## TWENTY-FOURTH CLAIM FOR RELIEF
### (Customary International Law: Cruel, Inhuman, or Degrading
Treatment)

211.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

212.    The acts described herein had the intent and the effect of grossly humiliating and debasing the Plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish, and breaking their physical or moral resistance.

213.    The acts described herein constitute cruel, inhuman or degrading treatment in violation of the law of nations under the Alien Tort Claims Act, 28 U.S.C. 1350, in that the acts violated customary international law prohibiting cruel, inhuman or degrading treatment as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

214.    Defendants are liable for said conduct in that Defendants, acting under color of law and their authority as federal officers, directed, ordered, confirmed, ratified, and/or conspired to cause the cruel, inhuman or degrading treatment of Plaintiffs.

215.    All Plaintiffs were forced to suffer severe physical and psychological abuse and agony and are entitled to monetary damages.

## TWENTY-FIFTH CAUSE OF ACTION
### (Conditions of Confinement – Fifth Amendment Due Process)

216.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

217.    By willfully and maliciously subjecting Plaintiffs to outrageous, excessive, cruel, inhuman and degrading conditions of confinement, including the denial of adequate nutrition, the denial of adequate exercise, the imposition of unnecessary and unlawful strip and body-cavity searches, extended detention in solitary confinement, and subjection to unprovoked and unjustified physical and emotional abuse, Defendants acting under color of

law and their authority as federal officers, have deprived Plaintiffs of liberty and/or property without due process of law in violation of the Fifth Amendment to the United States Constitution. Defendants HASTY, ZENK, THOMAS, and SHACKS, by failing to take reasonable measures to prevent and/or to remedy Plaintiffs' mistreatment, have deprived Plaintiffs of liberty and/or property without due process of law in violation of the Fifth Amendment to the United States Constitution.

218.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered severe pain and suffering, including physical injuries, emotional distress, humiliation, and embarrassment, and accordingly each Plaintiff is entitled to compensatory damages against Defendants jointly and severally in an amount to be determined at trial and punitive damages against each Defendant in an amount to be determined at trial.

## TWENTY-SIXTH CAUSE OF ACTION
### (Excessive Force – Eighth Amendment Cruel and Unusual Punishment)

219.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

220.    The unprovoked, unjustified, willful, and malicious intentional beatings of Plaintiffs by Defendants constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. Defendants HASTY, ZENK, THOMAS, and SHACKS, by failing to take reasonable measures to prevent and/or to remedy their subordinates' abuse of Plaintiffs, violated the Eighth Amendment's prohibition against cruel and unusual punishment.

221.    As a proximate result of the excessive force wielded against them, Plaintiffs sustained permanent injuries and incurred medical bills and other expenses. These injuries have caused and will continue to cause Plaintiffs great pain and suffering, both mental and physical, and accordingly each Plaintiff is entitled to compensatory damages against

defendants jointly and severally in an amount to be determined at trial and punitive damages against each Defendant in an amount to be determined at trial.

## TWENTY-SEVENTH CAUSE OF ACTION
### (Unreasonable Strip and Body Cavity-Searches – Fourth Amendment)

222.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

223.    By willfully and maliciously adopting, promulgating, failing to prevent, failing to remedy, and/or implementing the policy and practice under which Plaintiffs were repeatedly subjected to unreasonable and unjustified strip and body-cavity searches, Defendants subjected Plaintiffs to unreasonable searches and seizures in violation of the Fourth Amendment to the United States Constitution.

224.    As a result of Defendants unlawful conduct, Plaintiffs suffered physical injuries, emotional distress, humiliation, and embarrassment, and accordingly are entitled to. Plaintiffs are therefore entitled to compensatory damages against defendants jointly and severally in an amount to be determined at trial and punitive damages against each Defendant in an amount to be determined at trial.

## TWENTY-EIGHTH CAUSE OF ACTION
### (Religious Discrimination – First Amendment)

225.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

226.    Following the September 11, 2001 terrorist attacks, the defendants adopted a discriminatory attitude against Moslems.

227.    The plaintiffs are Jewish Israelis, not Moslems, but due to the similarity of language and the geographical location if Israel in the Middle East, and the ignorance or lack of understanding of the Arab-Israeli conflict and the fact that Israel is an ally of the United

States, the defendants mentally placed the plaintiffs in the same category as Moslems, and discriminated against them the same way.

228.    Defendants, by adopting, promulgating, failing to prevent, failing to remedy, and/or implementing a policy and practice of imposing harsher conditions of confinement on Plaintiffs because of the perception that they were Moselms violated Plaintiffs' rights under the First Amendment to the United States Constitution.

229.    As a result, Plaintiffs suffered extreme physical injuries and emotional distress, including permanent injuries, and accordingly are entitled to compensatory damages against the defendants, jointly and severally in an amount to be determined at trial and punitive damages against each Defendant in an amount to be determined at trial.

### TWENTY-NINTH CAUSE OF ACTION
### (Race Discrimination – Fifth Amendment Equal Protection)

230.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

231.    Following the September 11, 2001 terrorist attacks, the defendants adopted a discriminatory attitude against Arabs.

232.    The plaintiffs are Jewish Israelis, not Moslems, but due to the similarity of language and the geographical location if Israel in the Middle East, and the ignorance or lack of understanding of the Arab-Israeli conflict and the fact that Israel is an ally of the United States, the defendants mentally placed the plaintiffs in the same category as Arabs, and discriminated against them the same way.

233.    Defendants, by adopting, promulgating, failing to prevent, failing to remedy, and/or implementing a policy and practice of imposing harsher conditions of confinement on Plaintiffs because of Plaintiffs' race violated Plaintiffs' rights under the Fifth Amendment to the United States Constitution.

234.    As a result, Plaintiffs suffered extreme physical injuries and emotional distress, including permanent injuries, and accordingly are entitled to compensatory damages

against defendants, jointly and severally in an amount to be determined at trial and punitive damages against each Defendant in an amount to be determined at trial.

### THIRTIETH CAUSE OF ACTION
### (Conditions of Confinement – RFRA)

235.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

236.    Defendants, by adopting, promulgating, failing to prevent, failing to remedy, and/or implementing a policy and practice of imposing harsher conditions of confinement on Plaintiffs because of Plaintiffs' sincere religious beliefs, substantially burdened Plaintiffs' religious exercise and belief, without any legitimate justification, in violation of 42 U.S.C. §§ 2000bb-1.

237.    As a result, Plaintiffs suffered extreme physical injuries and emotional distress, including permanent injuries, and accordingly are entitled to compensatory damages against defendants, jointly and severally, in an amount to be determined at trial and punitive damages against each Defendant in an amount to be determined at trial.

### THIRTY-FIRST CAUSE OF ACTION
### (Interference With Religious Practice – RFRA)

238.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

239.    Defendants, by adopting, promulgating, failing to prevent, failing to remedy, and/or implementing a policy and practice of confiscating Plaintiffs' religious materials, regularly interrupting Plaintiffs' daily prayers, and denying Plaintiffs access to Friday prayers, substantially burdened Plaintiffs' religious exercise and belief, without any legitimate justification, in violation of 42 U.S.C. §§ 2000bb-1.

240.    As a result, Plaintiffs suffered extreme emotional distress, including permanent injuries, and accordingly are entitled to compensatory damages against defendants,

jointly and severally in an amount to be determined at trial and punitive damages against each
Defendant in an amount to be determined at trial.

### THIRTY-SECOND CAUSE OF ACTION
### (Excessive Force – RFRA)

241.    Plaintiffs incorporate by reference each and every allegation contained in
the preceding paragraphs as if set forth fully herein.

242.    Defendants, by beating and verbally abusing Plaintiffs because of
Plaintiffs' sincere religious beliefs, imposed a substantial burden on Plaintiffs' religious exercise
and belief, without any legitimate justification, in violation of 42 U.S.C. §§ 2000bb-1.
Defendants, HASTY, ZENK, THOMAS, and SHACKS, by failing to take reasonable measures to
prevent and/or to remedy their subordinates' abuse of Plaintiffs, acted in violation of 42 U.S.C.
§§ 2000bb-1.

243.    As a result, Plaintiffs suffered extreme physical injuries and emotional
distress, including permanent injuries, and accordingly are entitled to compensatory damages
against defendants, jointly and severally in an amount to be determined at trial and punitive
damages against each Defendant in an amount to be determined at trial.

### THIRTY-THIRD CAUSE OF ACTION
### (Religious Discrimination – 42 U.S.C. § 1985(3))

244.    Plaintiffs incorporate by reference each and every allegation contained in
the preceding paragraphs as if set forth fully herein.

245.    Defendants, agreed to deprive Plaintiffs of the equal protection of the
laws and of equal privileges and immunities of the laws of the United States because of
Plaintiffs' sincere religious belief, resulting in injury to Plaintiffs' person and property, in
violation of 42 U.S.C. § 1985(3).

246.    As a result, Plaintiffs suffered extreme physical injuries and emotional
distress, including permanent injuries, and accordingly are entitled to compensatory damages

against the defendants, jointly and severally in an amount to be determined at trial and punitive damages against each Defendant in an amount to be determined at trial.

## THIRTY-FOURTH CAUSE OF ACTION
### (Race and National Origin Discrimination – 42 U.S.C. § 1985(3))

247.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

248.    Defendants agreed to deprive Plaintiffs of the equal protection of the laws and of equal privileges and immunities of the laws of the United States because of Plaintiffs' race and/or national origin, resulting in injury to Plaintiffs' person and property, in violation of 42 U.S.C. § 1985(3).

249.    As a result, Plaintiffs suffered extreme physical injuries and emotional distress, including permanent injuries, and accordingly are entitled to compensatory damages against defendants, jointly and severally in an amount to be determined at trial and punitive damages against each Defendant in an amount to be determined at trial.

## JURY DEMAND

250.    Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

251.    WHEREFORE, Plaintiffs specifically request that the Court enter a judgment:

(a)    Declaring that Defendants' actions, practices, customs, and policies, and those of all persons acting on their behalf and/or their agents and/or employees, alleged herein, are illegal and violate the constitutional rights of Plaintiffs as to each applicable count;

(b)    Declaring that each individual Plaintiff's detention was unjustified, unconstitutional, unlawful and without probable cause to believe that he had any involvement in the September 11th terrorist attacks or other terrorist activity;

(c)     Enjoining Defendants to return immediately to Plaintiffs all personal identification, money and valuable personal items confiscated from them;

(d)     Awarding compensatory and punitive damages to Plaintiffs for the constitutional, statutory, and customary international law violations they suffered in an amount that is fair, just, reasonable, and in conformity with the evidence;

(e)     Appointing a neutral Special Master to assist in fashioning remedies and to monitor the implementation of those remedies;

(f)     Order such further relief as necessary to ensure that Defendants operate the MDC and Passaic facilities in compliance with the United States Constitution and customary international law;

(g)     Granting plaintiffs an award of counsel fees and expenses to the extent permitted by law;

(h)     Ordering such further relief as the Court considers just and proper.

## JURY DEMAND

All plaintiffs demand a trial by jury.


Dated: New York, New York
       September 13, 2004

                              Yours,
                              JAROSLAWICZ & JAROS, ESQS.
                              Attorneys for the plaintiffs

                              by:
                              Robert J. Tolchin (RT 3713)
                              Of counsel

                              150 William Street, 19th Floor
                              New York, New York 10038
                              (212) 227-2780